521 So.2d 842 (1988)
STATE of Louisiana, Appellee,
v.
James STRATTON, Jr., Appellant.
No. 19,420-KA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1988.
Timothy R. Fischer, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Don M. Burkett, Dist. Atty., Robert E. Burgess, Asst. Dist. Atty., for appellee.
Before MARVIN, SEXTON and LINDSAY, JJ.
MARVIN, Judge.
After being indicted for 2d degree murder and being convicted of the manslaughter of his wife, Stratton appeals, contending that the evidence is legally insufficient to convict and to exclude that the killing was a justifiable homicide committed in self-defense.
Defendant waived jury trial. The trial court, noting years of "trouble" between Stratton and his wife, concluded the defendant was guilty of manslaughter "in that the killing was done in the heat of passion."[1]
We disregard evidence that the trial court expressly disregarded and give appropriate weight to the evidence that the trial court expressly gave weight to. With respect to the remaining testimony not expressly mentioned by the trial court, we view the evidence in the light that most favorably supports the trial court's verdict.

FACTS
Stratton lived with his wife for more than a dozen years before he married her about seven months before the homicide and shortly after his wife obtained a judgment in a paternity and support action *843 against him. Stratton and his wife had two daughters. His wife had two teen-age sons by another marriage. These children were in the home the night of the homicide but did not witness it. The testimony of the 13-year-old son about how Stratton entered the home on that night was expressly disregarded by the trial court. The testimony of the older son sheds little light on the homicide. He said he came home late that night and was reprimanded by his mother shortly before he heard the gunshot. The children did not come out of their rooms until after police arrived.
Stratton went to a reunion of his family without his estranged wife on the night of the homicide where he ate food and drank, with two relatives, from two glasses of whisky. He was driven to his home about midnight by his niece and her companion. He said he entered the family home through the front door and went into his and his estranged wife's bedroom where he laid his .44 pistol, which he had removed from his truck, on the bedside table. He said his wife immediately began to argue with him and attacked him with her hands when he sat on the bed, but he succeeded in repelling the attack. He said his wife then grabbed a pair of scissors and threatened to kill him. He said that in response to her threat he got off the bed, grabbed his pistol from the bedside table at the opposite side, and then hastened back toward the bedroom door. The victim was 5'6" tall and weighed 170-180 pounds, according to the State's pathologist. Stratton's height and weight are not shown in this record.
Stratton and others testified that his wife had previously threatened his life, had once stabbed him with scissors without provocation some nine years before, and had once shot at him about a year before the homicide. Stratton also introduced testimony of the victim's reputation for violence.
Stratton and the victim had a stormy relationship during and before their marriage. An older first cousin of the victim who helped "raise her," testified that when the paternity and support action against Stratton was being discussed, he threatened the victim in the cousin's presence, and said that "... before I pay you any money, I'll sit in jail." The support controversy occurred just before Stratton and the victim married some seven months before the homicide.
Stratton said the homicide occurred in this fashion:
I ... got my pistol and I was coming back out the door ... I told her to get back, stay away from me. I cocked the gun. I thought she would stop. I cocked the gun, not in the attempt to shoot her, but to scare her back, but that didn't scare her back and she kept coming and the gun_____the gun just went off. It was not my intention to kill her.... [We were] about two or three feet apart ... She fell ... I stood there about 10 or 15 seconds ... I saw how bad she was bleeding ... that she was gone [sic] so I picked up the phone ... and told [police] ... what had happened.
The fingers of the victim's right hand were found protruding through the handles of the scissors in the manner shown by this partial reproduction of one of several photographs in evidence:
*844 
The trial court sustained objections to opinions by the pathologist about the position, before the gunshot, of the scissors in relation to the victim's hand. The trial court gave weight to the testimony of the pathologist about the trajectory of the bullet and to his opinion of the "probable" position of the victim's head when struck by the bullet.
The pathologist said that the bullet from the pistol struck the victim in the side of her face five centimeters (2") in front of her left ear lobe and traveled downward, severing the arteries under her chin where it joins the neck. From the trajectory of the bullet, the pathologist concluded that when the shot was fired, the victim's head probably was not facing defendant, but was turned toward her right shoulder with her chin tilted downward and toward her chest. He opined that the victim was not face to face with, or confronting, Stratton when the fatal shot fired as Stratton had testified.
The trial court, noting the problems between Stratton and his wife before and after their marriage, said:
... defendant is guilty of manslaughter in that the killing was done in the heat of passion ... I want to state ... that I disregard the testimony of the [younger son] and give no weight to it. And at the same time, I did give weight to the testimony of the [pathologist about the path of the bullet and the position of the victim's head]. I want that in the record so the higher courts can look at it.
At sentencing, the trial court concluded its remarks in this language:
And because of the circumstances in this caseat least it started out in self-defense, I don't think it wound up in self-defense and so found in arriving at the judgment in this case because of the circumstances of the case and the problems you had had with your wife over the many yearsI gave you the least sentence the law would let me impose [five years at hard labor without suspension, probation, or parole].

SELF-DEFENSE; JUSTIFIABLE HOMICIDE; ACCIDENT; MANSLAUGHTER
Before pronouncing its homicide-in-heat-of-passion verdict, the trial court expressly mentioned the problems raised by the arguments and stated:
And I have read the law several times during the trial of this case, and sometimes while sitting here on the bench.
From the trial court's verdict of manslaughter which would be murder (LRS 14:31(1)), we deduce that the trial court considered all appropriate statutes and rejected the application of the § 31(2)(a) manslaughtera homicide committed "without any intent to cause death or great bodily harm ... [w]hen the offender is engaged in the perpetration ... of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person."
The trial court's statement at sentencing, "It started out in self-defense ...," suggests *845 either that the court deemed the victim was the aggressor until the incident ended in her being fatally shot and found the deadly force used by Stratton was unreasonable and excessive, or that the victim's initial aggressionattacking Stratton on the bed with her handsended when he succeeded in repelling her. We shall not further speculate on the remark.
To apply LRS 14:31(1), the trial court had to have deliberately concluded that Stratton voluntarily and willfully pulled the trigger of the pistol, desiring that the bullet therefrom cause either death or great bodily harm to the victim under circumstances that would not legally justify the homicide under LRS 14:20(1), (2), but under circumstances of sudden passion immediately caused by provocation sufficient to deprive Stratton (or an average person) of his self control and cool reflection. Without these tacit findings, the trial court could not have rendered the verdict of "manslaughter... done in the heat of passion."
Criminal conduct that produces a homicide is legally excused, or justified, only under the four circumstances described in LRS 14:20. Each of the § 20 circumstances envisions willful or voluntary conduct and either a generally or specifically intended consequence. A truly involuntary act that results in an unintended homicide is not criminal conduct and is not contemplated by § 20. See LRS 14:8-10 and Reporter's Comments thereunder. Criminal conduct in this sense is a physical act of the defendant which produces criminal consequences. An involuntary act in this context is not criminal conduct. LRS 14:8-10. LaFave and Scott, Criminal Law, § 25.[2]
The State has the burden of proving beyond a reasonable doubt every element of the crime, here a § 31(1) manslaughter. LRS 15:271, 15:438; Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The verdict and the facts expressly and tacitly found by the trial court raise the critical issue of whether the homicide was justifiable under § 20, notwithstanding Stratton's assertions. The State's burden includes the burden of proving beyond a reasonable doubt that the killing was not justified. State v. James, 464 So.2d 299 (La.1985).[3]

SUFFICIENCY OF THE EVIDENCE
Our review is obfuscated by the absence from the record of physical demonstrations and diagrams made or drawn by the witnesses. The demonstrations were not "read" into the record. No diagrams were introduced in the record. The physical condition of Stratton immediately after police arrived was not described by any witness. Stratton said the victim pinned him to the bed and scratched him in the initial attack. The trial court disregarded evidence that might have shown Stratton entered the home in an aggressive or belligerent manner.
The sole evidence to prove that a criminal homicide occurred is the testimony of the pathologist about the trajectory of the bullet into the victim's head. The pathologist acknowledged that he would have to know where the gun was located when the shot was fired in order to definitely state the *846 conclusion where the victim's head was. He agreed that it would be normal for one to turn her head away from a pointed pistol that was being cocked. He said, "I have not testified exactly [as to the position of the head]. I have testified more probably than not ... I can't tell you exactly, but I can give you probabilities." He explained that even if the head was "turned toward her right shoulder and inclined forward [when she was shot] ...," as he believed, that circumstance would not prove that the victim's shoulders were perpendicular to Stratton's shoulders instead of squarely confronting (or parallel to) him. "That [turn of her head] would, more probably than not, put her left side forward, but [it] doesn't prove that. It simply means that her head is turned toward the right shoulder and down, like so (demonstrating)."
At this juncture we reiterate that the State's evidence must achieve the standard of beyond a reasonable doubt which is greater than the standard of more probable than not. State v. Shapiro, 431 So.2d 372, 387-388 (La.1983); LRS 15:271, 15:438; Jackson v. Virginia, supra; State v. James, supra.
The State argues that the evidence proved beyond a reasonable doubt a § 31(2)(a) manslaughter and emphasizes the testimony of the 13-year-old son of the victim which indicates the conclusion that Stratton was belligerent and was the aggressor from the time he entered the front door of the home. As we have attempted to explain, the trial court remarks [that this was a § 31(1) homicide done in the "heat of passion"] compel us to deduce that the trial court deliberately rejected any interpretation of the facts that would allow the finding of a § 31(2)(a) manslaughter. Furthermore, we cannot accept as credible, testimony that the trier of fact in a criminal case has [expressly in this instance] found incredible and has "disregarded."
The State rhetorically asks such questions as WHY Stratton would marry a woman he was afraid of and WHY he would place a pistol within her reach and would not attempt to withdraw from the conflict by walking out of the bedroom door. The State did not cross examine defendant on the rhetorical questions. The State did not show that the bedroom door was open. Any answer to the rhetorical questions by defendant, short of the ultimate confession by defendant of every element of the crime, would not aid the State in its burden of proof.
The sufficiency-of-the-evidence test, whether expressed in terms of doubt or of hypothesis, is the reasonableness of the ultimate conclusion on the facts and on the inferences which may be drawn from the facts. In some cases a defendant's circumstantial theory or hypothesis is found to be remote or unreasonable when compared to the prosecution's theory or hypothesis of defendant's guilt which is consistent overall with the evidence. State v. McFadden, 476 So.2d 413 (La.App. 2d Cir.1985), writ denied.
On this record, it is equally reasonable to conclude that Stratton was being attacked by his wife who was armed with scissors and that he reasonably believed that it was necessary to cock the pistol, to point it at her, and to pull, however quickly and instinctively, the trigger to prevent the forcible felony to himself, as it is to conclude that his belief and conduct were unreasonable. LRS 14:20(2). Compare factually, State v. Garcia, 483 So.2d 953 (La. 1986); State v. Savoy, 418 So.2d 547 (La. 1982).

DECREE
Defendant's conviction is therefore reversed and defendant is discharged.
NOTES
[1] LRS 14:31(1) describes such a homicide as one "which would be murder ... but the offense is committed in sudden passion ... immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection."
[2] Voluntary conduct that produces an unintended consequence of homicide, under one hypothetical circumstance, might legally constitute a justifiable homicide, but under another circumstance, might legally constitute a § 31(2)(a) manslaughter which is defined as a homicide committed without any intent to cause death where the offender is engaged in the perpetration of an intentional misdemeanor directly affecting the person.
[3] Proper analysis of Stratton's version that he cocked the gun to scare his wife, who was "coming at him," and it simply "went off" in his hand, questions whether his act of pulling the trigger was a true reflex that was involuntary or unwilled. A true reflex is a muscular reaction in which the mind will have no share such as a knee jerk or the blinking of the eyelids. The term reflex does not cover all instances of bodily movement in quick responses to some outside force or circumstances. LaFave and Scott, supra, at p. 181. A truly involuntary act is to be distinguished from the quick or instinctive response to outside circumstances which may constitute criminal conduct under LRS Title 14.

If an accused had a convulsion and lost control of his muscles, there would be no voluntary muscular movement and therefore no crime, even though someone was fatally struck by the bullet fired from a pistol held by the accused. Reporter's Comment, LRS 14:8.