717 So.2d 648 (1998)
STATE of Louisiana, Appellee,
v.
Connie ADDISON, Defendant-Appellant.
No. CR97-1186.
Court of Appeal of Louisiana, Third Circuit.
March 6, 1998.
Writ Denied September 4, 1998.
Jerold Edward Knoll, Michael Francis Kelly, Marksville, for State of Louisiana.
Charles Addison Riddle, III, Marksville, for Connie Addison.
Before DECUIR, AMY and PICKETT, JJ.
DECUIR, Judge.
This is an appeal of a conviction and sentence for manslaughter. The defendant is Connie Addison, and the district judge[1] sentenced her to twenty (20) years at hard labor, which is one-half the statutory maximum. Thereafter, the judge suspended fifteen (15) of these years, leaving the defendant to serve five (5) years at hard labor, and placed her on four (4) years supervised probation subject to general and special conditions of probation.
In her appeal, the defendant attacks the sufficiency of the evidence, the exclusion of *649 character evidence and the excessiveness of her sentence.

FACTS
At trial, the facts of the stabbing were presented through the statement of the defendant. The first witness was Detective Clint Lemoine, a detective with the Avoyelles Parish Sheriff's Office. Detective Lemoine was called to investigate the stabbing late in the evening of July 6, 1996. At 12:53 p.m., the defendant gave a voluntary statement about the incident. The defendant described that she and Tyrone Sampson were boyfriend and girlfriend. During the afternoon, they had been drinking and arguing during the evening. Subsequently, the defendant left Tyrone Sampson and his cousin out on the front porch of the house where the two men continued to drink. At around 10:00 in the evening, Tyrone Sampson came into the bedroom and continued arguing with the defendant and ordered her to go home. The defendant responded that she could not go home because she had been drinking and could not drive with her children to her home in New Orleans. Instead, she said she would go home first thing in the morning.
Thereafter, the argument turned to the subject of the defendant's children. Tyrone Sampson made a comment about the father of the defendant's son, and the seven-year-old boy made a response back to the defendant. The defendant then hit the little boy on the side of his head and the defendant began to argue with him. The defendant continued to argue with Tyrone Sampson about his hitting her seven-year-old son.
When the defendant told Tyrone Sampson to stop hitting her son and she hit him with her fists, he then told her "Bitch, I'm going to kill you." Tyrone pulled out a white-handled kitchen knife. A photograph of this knife was introduced into evidence, S-4; it was described as a twelve-inch knife, and from the photograph, it appears to have a six and one-half inch blade. The defendant then grabbed a smaller blue-handled knife with a three-and--half inch blade; a photograph of this knife was introduced as S-3.
The defendant and Tyrone were standing up in bed when they began to get into a fight. Tyrone Sampson first stabbed the defendant in the right forearm. All witnesses who saw the defendant on the night of the stabbing testified that she had a fresh puncture wound, or stab wound on her right forearm. After Tyrone Sampson stabbed the defendant in her right arm, she stabbed him twice with her knife. The defendant recalled that after she first stabbed Tyrone while they were standing in the bed, she hopped out of the bed and Tyrone kept coming toward her with his knife. The defendant somehow stabbed him again and then she ran out of the room calling for Alice Friels. The defendant said that as she was running out of the room, she still had the blue-handled knife in her hand. She was calling out for Alice to call the police, to call 911. When Alice and Sharon Friels came into the room where the defendant and Tyrone Sampson were, the defendant said neither Alice nor Sharon Friels wanted to call the police. The defendant then said she hurried up and went behind Alice Friels and Tyrone Sampson then said something about being stabbed, and he fell to the floor. Sharon Friels called 911. Sharon said she would not call an ambulance because there was nothing wrong with Tyrone, he was simply drunk or was going to pass out. The defendant then called 911 herself.
The State presented testimony of only three witnesses: Detective Clint Lemoine; Dr. L. J. Mayeaux; and Ms. Sharon Friels. Detective Clint Lemoine testified he was contacted about a stabbing in the Evergreen Community of Avoyelles Parish late on July 6, 1996. The defendant and her children were taken to the Avoyelles Parish Sheriff's Office where the defendant gave her taped statement. This recorded statement was played for the jury. The detective identified the two knives used in the fight and said that after the defendant finished her statement, the hospital called to inform them that Tyrone Sampson had died.
Among the photographs introduced at trial, Detective Lemoine identified one showing the stab wound on the defendant's right arm and bruises and scratches on her left arm. The photographs of the bedroom where the defendant and Tyrone Sampson fought, *650 showed the bed linens and clothes were scattered on the floor.
The defendant's wounds did not require medical attention. But Detective Lemoine said they were fresh and he did not doubt their source. Detective Lemoine concluded his testimony by saying that nothing in his investigation of the death of Tyrone Sampson contradicted the defendant's description of the events leading to the two stabbings.
The second witness for the State was Sharon Friels, Tyrone Sampson's eighteen-year-old cousin. Tyrone Sampson lived in a two-bedroom house with his cousins, Sharon Friels and her mother, Alice Friels. While the defendant and her children were visiting with Tyrone Sampson, Sharon Friels let them sleep in her back bedroom. On the night of the stabbings, Sharon Friels heard a "thump"; got up from the living room sofa where she was sleeping and went to see what happened. Sharon Friels did not witness the fight and the stabbings; she simply saw what happened afterwards. Before she reached the back bedroom, she saw the defendant and Tyrone Sampson coming out of the back bedroom through the kitchen. Sharon Friels met the couple in the kitchen where she saw Tyrone Sampson holding both the defendant's hands and the defendant holding a blue-handled knife in her right hand. Sharon Friels told Tyrone Sampson to let go of the defendant and Tyrone Sampson complied. The defendant ran to Sharon Friels' mother, Alice Friels, and was calling out for them to call 911 or call the police. Tyrone Sampson went to the living room where he said "the bitch stabbed me" and then collapsed on the floor.
Sharon Friels testified that after she made the first call to 911, she went to the back bedroom and found a white-handled knife on top of some blankets on the floor on the side of the bed. She picked up the white-handled knife and put it in the sink. This action occurred before the police arrived. The next day, the police asked about the white-handled knife, and Sharon Friels turned it over to them. Although the police noted that the blue-handled knife had blood on it, obviously there was no blood on the white-handled knife because it had been washed.
The State then called Dr. L.J. Mayeaux, the coroner for Avoyelles Parish. Dr. Mayeaux testified that Tyrone Sampson suffered two stab wounds, both from the same blade. One was simply a non-fatal muscular wound. However, the other wound lacerated the subclavian vein which is one of the major veins returning blood to the heart. Tyrone Sampson died of loss of blood within one hour of the stabbing.
The defendant's first witness was an employee of the 911 system who provided the tapes of the two calls from the Friels residence, the first by Sharon Friels and a second by the defendant, and the call by 911 to the Friels' residence to see if the police and ambulance had arrived.
The second defense witness was Deputy William Archer, who was the first police officer on the scene. Deputy Archer spoke with the defendant and noticed the wound on her right arm. Deputy Archer also noticed the defendant was scared, frantic, upset about the fight, and unsure about what was happening.
Next, the defense called Deputy Roland Patterson who helped investigate the scene of the stabbings. In the back bedroom, where the stabbings occurred, Deputy Patterson saw clothing and bed linen off the bed and thrown all over the floor, indicating a struggle had taken place.
The defendant then called her seven-year-old son, Leroy Shannon, Jr. Leroy Shannon, Jr. and his two-year-old sister were the only witnesses in the bedroom at the time of the stabbings. Leroy Shannon was first found competent to testify and then questioned about the fight. When asked what happened on the night, Leroy Shannon testified:
We was about to go to bed and Tyrone said something about my dad, and he said my daddy was stupid and I got up and said he was stupid and he got mad and got up and slapped me upside my head. My mama told him to stop and he wouldn't stop, and my mama told him to stop again and he wouldn't stop. So he started fighting my mama and he pulled out a knife and cut my mama on her arm and then she got *651 the knife from off the dresser and they both were fighting with the knives.
Leroy Shannon further testified that Tyrone Sampson was standing when he pulled out the white-handled knife and that his mother was also standing.
The State argued that one major difference between Leroy Shannon's description of the stabbings and that of the defendant was that Leroy said the defendant's knife was already on the top of the dresser next to the bed when Tyrone Sampson pulled out his knife. However, Addison's statement was consistent with Leroy's testimony. The defendant said in her statement that she had previously retrieved a knife from the kitchen and thus, there was no contradiction between the testimony of Leroy Shannon, Jr., and the statement of the defendant.
Finally, the defendant called her sister, Patty Addison, who was going to testify about the moral character of the defendant and her peaceful nature. However, the State objected and the trial judge sustained this objection.
The jury returned a unanimous verdict of guilty of manslaughter. At the conclusion of a sentencing hearing, the defendant was sentenced to twenty (20) years at hard labor with fifteen (15) years suspended and she was ordered to serve the first five (5) years. As to the suspended portion of the sentence, the judge gave the defendant four (4) years of supervised probation and imposed the general conditions provided by Article 895 of the Code of Criminal Procedure plus special conditions.
The defendant has appealed her conviction and sentence. Originally, the defendant assigned four errors in the trial court. In her appellate brief, there are seven errors assigned; however, a review of the seven assignments of error reveal that original Assignment of Error No. 1 has been broken down into three separate assignments of error. Therefore, the defendant has not raised any new issues on appeal that were not previously covered by the original assignments of error.

SUFFICIENCY OF EVIDENCE
The defendant has combined her discussion of the first three assignments of error since they all concern the sufficiency of the evidence. We will also include the sixth assignment of error since the motion for post verdict judgment of acquittal raises the same arguments and standard of review as a Jackson review.
Under our law the fact that an offender's conduct is criminal, yet justifiable, constitutes a defense to prosecution for any crime based on that conduct. La.R.S. 14:18. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La.R.S. 14:20(1). Also, a homicide is justifiable when committed in defense of another person. La.R.S. 14:22.
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559, (La. 1983); State v. Duncan, 420 So.2d 1105 (La. 1982). A defendant in a homicide prosecution who asserts that he acted in self-defense or defense of others does not have any burden of proof on that issue. The State bears the burden of proving beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Patterson, 295 So.2d 792 (La.1974).
In the present case, the State presented no eyewitnesses to the stabbings. The evidence relied upon by the State as proof that the killing was not done in self-defense consists only of Addison's tape-recorded statement. The jury did not have the benefit of observing a testifying witness. Generally, this reviewing court will defer to the jury's determination of credibility; however, the jury's only evidence of the stabbings came from a tape recording of the *652 defendant's statement. Thus, the jury was in no better position to determine credibility or believability than this reviewing court. It is clear from the defendant's statement and the testimony of the only other eye witness, Leroy Shannon, Jr., that she did not stab Tyrone Sampson until after he had committed a battery upon her seven-year-old son, and after he had pulled out a knife and stabbed her with it.
At trial, the State had argued that the white-handled knife was "planted" by the defendant, but there was no testimony in support of this allegation. Both the statement of the defendant and trial testimony of Leroy Shannon said that Tyrone Sampson was armed with the knife and stabbed Addison with it. Even the State's witness, Sharon Friels, testified she found the knife in the bedroom moments after she called 911. When Sharon Friels moved the knife, the defendant and Tyrone Sampson had left the room, the defendant had not reentered it; therefore, no one could have "planted" the knife.
La.R.S. 14:21 provides, "a person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." State v. Carrier, 95-1003, p. 7 (La.App. 3 Cir. 3/6/96); 670 So.2d 794, 798-99, writ denied, 96-0881 (La.9/20/96); 679 So.2d 431. From the evidence presented, it is obvious that Tyrone Sampson was the aggressor and not Addison, and the actions of Addison were simply in response to his aggression.
Finally, the defendant was not the one who started the argument and she did not continue to argue. When Tyrone Sampson told Addison to leave, she said she would leave first thing in the morning; there is no evidence that Addison continued to verbally spar with Tyrone Sampson. The uncontradicted evidence is that even after Addison and her children had laid down to go to sleep, Tyrone Sampson continued to argue and complain about Addison. No evidence was presented that Addison provoked the battery committed upon her young son. Addison did not strike Tyrone Sampson with her fists until after he had committed an unprovoked battery upon her son. The response of Addison's seven-year-old son to one of Tyrone Sampson's remarks led Sampson to hit the child and this led Addison to argue with Sampson and hit him with her fists when he refused to stop. Tyrone Sampson did not withdraw from the confrontation, but instead pulled out the white-handled knife and attacked Addison. No evidence was presented that Addison provoked Tyrone Sampson into pulling out the white-handled knife and stabbing her. Obviously Tyrone Sampson was not attempting to retreat or withdraw from the conflict; Addison did not stab him in the back. When Addison jumped off of the bed during the fight, Tyrone followed her and she stabbed him a second time. Even when Addison tried to flee the bedroom and get help from the Friels, Tyrone continued to pursue her.
There is no unqualified duty to retreat in an altercation. However, the possibility of escape is a recognized factor in determining whether or not a defendant reasonably believed deadly force was necessary to avoid the danger. State v. Rader, 609 So.2d 857 (La.App. 5 Cir.1992). Addison had told Tyrone Sampson she could not go home that night since she had been drinking and was in no condition to drive to New Orleans with her two young children. At the time, Tyrone Sampson was simply arguing with the defendant, and he had not threatened her or her children nor had he done anything that would have alarmed her. Once Tyrone Sampson began to physically fight, retreat was not an option for Addison because it would have been difficult for her to leave with her two-year-old daughter and seven-year-old son. Also, once Tyrone Sampson began to physically attack Addison, she could not leave the children behind in the same room as Tyrone Sampson. This fact is particularly true since Tyrone Sampson's first physical attack was upon Addison's seven-year-old child.
The jurisprudence has summarized the determination of guilt, in such instances, to a twofold inquiry: (1) from the facts presented, could the defendant reasonably have *653 believed his life to be in imminent danger; and (2) was deadly force necessary to prevent the danger? State v. Carrier, 95-1003 (La.App. 3 Cir. 3/6/96); 670 So.2d 794. Most all reported cases discussing self-defense have had to determine if the defendant's belief that he was in danger was a reasonable belief. In none of the cases found had the defendants actually been injured by the victims before the defendants had to kill them. Unlike all other reported cases of self-defense, it is not difficult to determine that Addison's belief that her life and the lives of her children were in danger was a reasonable belief because Tyrone Sampson became increasingly aggressive, culminating in the battery of Addison's seven-year-old son and her stabbing.
This court has upheld a district court's ruling granting a motion for post verdict judgment of acquittal based upon the homicide being committed in self-defense. In State v. Brown, 93-1471 (La.App. 3 Cir. 5/4/94); 640 So.2d 488, the defendant was with a group of young men who were surrounded by a larger group or gang of young men armed with sticks and pipes. The larger group chased the defendant, who did not provoke the confrontation, and began to beat him with their sticks when the defendant pulled out a handgun and shot one of the gang members. This court agreed with the trial judge that the defendant was acting in self-defense. In State v. Makar, 578 So.2d 564 (La.App. 3 Cir.1991), the defendant shot the victim who had threatened and intimidated him and had a history of physical abuse of the defendant. The defendant acted in self-defense; although the defendant had armed himself with a gun, he had not provoked the confrontation and he had no avenue of retreat or escape. In State v. Carroll, 542 So.2d 762 (La.App. 4 Cir.), writ denied, 550 So.2d 625 (La.1989), the defendant and victim had fought in a bar and the defendant left. When the defendant returned, the victim came after the defendant with a raised barstool. The defendant had not provoked any confrontation and when he tried to leave the bar, he could not. The defendant was forced to shoot the victim and in an attempt to hit the victim's shoulder and no vital organs, the defendant inflicted a fatal wound. The court found the defendant's actions to be justified.
In a case similar to the present case, State v. Stratton, 521 So.2d 842 (La.App. 2 Cir. 1988), the defendant-husband came home late and was attacked by his angry wife who was armed with scissors. When the wife would not stop advancing on the husband, he aimed his .44 pistol at her and pulled the trigger, shooting her in the head. The court found the husband's actions justified since the wife was the aggressor, and she refused to stop advancing on the husband who said he never intended to shoot and kill his wife. In another family-related killing, State v. Williams, 483 So.2d 999 (La.1986), the defendant had been previously beaten by his brother-in-law who confronted the defendant as the defendant was trying to leave the area. The victim was armed and made several threats before the defendant shot him. The court found the defendant acted in self-defense since he did not provoke the confrontation and was attempting to leave the area when the armed victim cut off the defendant's escape. In State v. Hart, 457 So.2d 791 (La. App. 1 Cir.1984), writ denied, 462 So.2d 1262 (La.1985), a game room operator shot a belligerent patron who along with two of his friends were menacingly advancing upon the operator and threatening him for asking them to stop abusing the machines. The operator said he pulled out his .357 gun to hold the patrons until he could call the police, but the gun discharged and killed the victim. The court found the operator was not the aggressor and did nothing to provoke the victim into threatening him and advancing upon him. Finally, in State v. Lynch, 436 So.2d 567 (La.1983), a battered wife shot her husband who was threatening her and pursuing her as she ran out of their home. The defendant pointed a gun at the victim and told him to stop, but he did not and she shot him. In Lynch, several neighbors witnessed the shooting and corroborated the defendant's testimony.
In State v. Gonday, 442 So.2d 703 (La.App. 1 Cir.1983), a homicide was found to be justified based upon the defense of others. See La.R.S. 14:22. In Gonday, the defendant's truck was hit by another truck that left the *654 scene of the accident. The defendant chased the other truck and forced it to stop. The defendant got out of his truck armed with a shotgun and ordered his passenger to take away the keys to the other truck so it would not leave again. The driver of the other truck refused to let the passenger take the keys, and he reached for his handgun in his glove compartment. The defendant shot the other driver claiming he was defending his passenger, who was unarmed. The court found the defendant's response was reasonable and ordered an acquittal based upon La.R.S. 14:22.
We find that Tyrone Sampson was the aggressor in the final confrontation. Addison did not inflict the first stab wound until after Tyrone Sampson had committed an unprovoked battery upon her seven-year-old child and stabbed her when she hit him with her fists for the battery on young Leroy. According to the evidence, the second stab wound was not inflicted until after Addison jumped off of the bed and Tyrone Sampson continued to pursue her. Even when Addison ran out of the room, calling for the Friels to call 911 or the police, Tyrone Sampson followed her. Tyrone Sampson did not stop his pursuit of her or his contact with her until Sharon Friels told him to let go of Addison, and he thereafter collapsed from his injuries.
Under the burden of proof principles applicable to criminal cases, the State has failed to exclude justification by self-defense and defense of others. That was the State's burden of proof, not defendant-Addison's. For the foregoing reasons, the conviction and sentence of Connie Addison are reversed and set aside. The case is remanded, and the trial court is ordered to grant a judgment of acquittal, and release the defendant from custody.

CONCLUSION
The State failed to prove beyond a reasonable doubt that the stabbing death of Tyrone Sampson was not committed by Connie Addison in self-defense or defense of her children. For the foregoing reason, the conviction and sentence of Connie Addison are reversed and set aside. The case is remanded, and the trial court is ordered to grant a judgment of acquittal, and release the defendant from custody.
REVERSED, SET ASIDE AND REMANDED.
NOTES
[1] The judge presiding over the trial, Michael J. Johnson, is no longer a district judge. Judges William J. Bennett, Guy E. Humphries and Ted R. Broyles have presided over the defendant's sentencing and post-verdict proceedings.