STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-993

STATE OF LOUISIANA

VERSUS

KYLE JAMES TOUPS

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 141,202
HONORABLE PATRICK L. MICHOT, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of Elizabeth A. Pickett, Phyllis M. Keaty, and D. Kent Savoie, Judges.

AFFIRMED WITH INSTRUCTIONS.

Keith A. Stutes
District Attorney
Michele S. Billeaud
Assistant District Attorney
Post Office Box 3306
Lafayette, Louisiana 70502-3306
(337) 232-5170
Counsel for Appellee:
    State of Louisiana

**Edward K. Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, Louisiana 70602-1641**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
     **Kyle James Toups**

**KEATY, Judge.**

Defendant, Kyle James Toups, was indicted for negligent homicide, a violation of La.R.S. 14:32. After a jury trial, Defendant was found guilty as charged. Defendant was sentenced on July 15, 2016, to two years imprisonment at hard labor, with credit for time served, and ordered to pay restitution to the victim's family in the amount of six thousand dollars. Defendant filed a Motion to Reconsider Sentence which was denied without a hearing.

Defendant has perfected a timely appeal wherein he claims that the State did not negate his self-defense claim, thereby failing to prove negligent homicide beyond a reasonable doubt, and that his sentence is excessive. For the following reasons, we affirm Defendant's conviction and sentence.

## FACTS

After an evening of drinking in downtown Lafayette, Louisiana, Defendant; his brother, Travis Toups (Travis); and Jacob Landry encountered the victim, Luke Michael Darby, on the street just before 2:00 a.m. on Sunday, October 14, 2012. Travis and the victim bumped into each other and briefly argued before the victim punched Travis in the face. Defendant then took a knife from his pocket and swung toward the victim's chest. Thereafter, the victim and Defendant fled the scene. On Monday morning, the victim was discovered dead outside a nearby business. An autopsy revealed his cause of death as a single stab wound to the heart.

## DISCUSSION

### *Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After review, we have found

one error patent. Defendant was advised that he had "two (2) years within which to file for post-conviction relief." Louisiana Code of Criminal Procedure Article 930.8 (emphasis added) provides that a defendant has "two years *after the conviction and sentence become final*" to seek post-conviction relief. Because the advisement given to him was insufficient, we direct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending written notice to him within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. *See State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

### *Sufficiency of the Evidence*

In his first assigned error on appeal, Defendant asserts that the evidence presented at trial was insufficient to sustain his conviction for negligent homicide. At trial, Defendant admitted that he stabbed the victim, but he claimed that the killing was justified because he was acting in defense of his brother.

Negligent homicide is defined as "[t]he killing of a human being by criminal negligence." La.R.S. 14:32(A)(1). Louisiana Revised Statutes 14:12 states that: "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20(A)(1). In addition, La.R.S. 14:22 provides that "[i]t is justifiable to use force or violence or

2

to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person." When self-defense or defense of another is claimed as a justification for the homicide, the defendant does not bear the burden of proof on that issue; instead, the State is required to prove beyond a reasonable doubt that the defendant did not act in self-defense or in the defense of another. *See State v. Prudhomme,* 02-511, (La.App. 3 Cir. 10/30/02), 829 So.2d 1166, *writ denied,* 02-3230 (La. 10/10/03), 855 So.2d 324; *State v. Addison*, 97-1186 (La.App. 3 Cir. 3/6/98), 717 So.2d 648, *writ denied*, 98-938 (La. 9/4/98), 723 So.2d 955.

In *State v. Alexander*, 04-788, pp. 1-2 (La.App. 3 Cir. 11/17/04), 888 So.2d 401, 402 (alteration added), this court stated:

> When reviewing the sufficiency of the evidence, appellate courts are controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and must determine "whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La. 1984). . . . Therefore, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that he did *not* act in self-defense.

Furthermore, on questions of the sufficiency of the evidence, the appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The pertinent evidence presented at the trial of this matter is outlined below. Jared Istre, an officer in the Crimes Against Persons section of the Lafayette Police Department, was the first witness called by the State. Officer Istre testified that on the morning of October 15, 2012, he received a call to investigate a body

discovered in the bushes outside an office on Polk Street. Officer Istre stated that the person who called the police thought the man was sleeping, but upon his arrival at the scene, he realized that the man was dead. According to Officer Istre, it became a homicide investigation after the coroner arrived and lifted the victim's shirt to reveal a single stab wound to his chest. A driver's license found in the victim's wallet identified him as Luke Michael Darby. Police officers then began canvassing the area and were able to follow a blood trail to a parking garage on the corner of Vermilion and Polk Streets. Officer Istre learned that a stabbing had occurred nearby on the corner of Jefferson and Vermilion Streets just prior to the altercation at issue in this appeal and that at least five police officers had responded to that incident. Officer Istre was able to verify that all of the suspects and victims of that incident were accounted for, which ruled out the possibility that Mr. Darby was injured in that first stabbing. During the police's search of the area in conjunction with this incident, an attendant for the parking garage on Vermilion Street informed another police officer that a knife had been found in the garage. The knife was collected and swabbed for DNA analysis.

According to Officer Istre, a tip was called into the police department indicating that Mr. Landry was a witness to the victim's stabbing. Mr. Landry was brought in for an interview during which Officer Istre learned that Defendant, a co-worker of Mr. Landry, had stabbed the victim. Thereafter, Mr. Landry and Officer Istre returned to the crime scene where Mr. Landry was videotaped as he described the events leading up to the victim's stabbing. Mr. Landry pointed out where Defendant tossed the knife after the victim was stabbed, which location was consistent with where the parking garage attendant said the knife given to the police was found.

4

An arrest warrant was issued for Defendant, and he was taken into custody in Texas, where he was working. Officer Istre traveled to Texas on October 17, 2012, having Defendant sign an advice of rights form before questioning him about the stabbing. Officer Istre testified that initially Defendant denied being downtown on the night of the stabbing.[1] However, after Officer Istre suggested to Defendant that perhaps he stabbed the victim in self-defense of his brother, Defendant began to cry and nodded his head in agreement when questioned about the stabbing. Eventually, Defendant told Officer Istre that as he, Travis, and Mr. Landry were passing the parking garage, the victim walked out and bumped shoulders with Travis. The victim then told Travis, "I'm going to fucking kill you," and punched him in the face. Defendant stated that he pulled out his knife and swung at the victim's chest. Although he believed he cut the victim, Defendant did not think he hurt the victim "that bad" because the victim ran away toward Polk Street. Defendant told Officer Istre that he then ran toward where his car was parked across the street in front of Parc San Souci, tossing his knife into the parking garage as he passed it. Defendant stated that he later asked Mr. Landry to see if he could retrieve the knife. Although Defendant acknowledged that he saw some officers nearby in connection with the earlier incident, he did not tell them about what had just occurred nor did he call the police to report that he had stabbed someone in self-defense after that person attacked his brother. Officer Istre

---

[1] In the interview, although Defendant admitted that he was downtown the night of the stabbing, he initially denied that an incident occurred in front of the parking garage. Defendant said he was scared and did not want to say anything to hurt himself or to cause him to lose his family. He then mentioned having lost a brother in a drunk-driving accident.

testified that Defendant said he never saw a weapon on the victim. A videotape of Defendant's one-hour-and-eight-minute interview was played to the jury.[2]

On direct examination, Officer Istre relayed that when he interviewed Travis three days after the stabbing, he saw no observable injuries to Travis' face. He admitted on cross-examination, however, that Travis told him that his lip was cut where the victim had punched him. Officer Istre was questioned about a report he prepared wherein he noted that according to the information on their driver's licenses, Defendant, Travis, and the victim were all about the same height, approximately 5'6" to 5'7" tall, and they all weighed between 140 and 165 pounds.

During his investigation, Officer Istre secured video from a nightclub across the street from the parking garage which showed a person believed to be the victim, who appeared to be injured, stumbling from the parking garage, and heading toward the office building where he was later found. That video was played to the jury. According to Officer Istre, he reviewed video taken by a security camera on the corner of Jefferson and Vermilion Streets, which appeared to show the victim yelling at the crowd during the incident that the police responded to before he was stabbed. That video was not preserved. Officer Istre also reviewed a video recorded at the parking garage, but he saw nothing on it which he deemed important. That video was also not preserved.

The State's next witness was Darrell Francis, the parking garage attendant who was working on the day the victim's body was found. He stated that his supervisor showed him a knife that she had found that morning, but he threw it away after realizing it was broken. When he later saw police officers investigating

---

[2] Although Defendant later testified that he did not know his interview was being videotaped, the defense did not object to it being shown to the jury.

nearby, Mr. Francis told them about the knife and showed them the trash can in which he had disposed of it. The parties then jointly stipulated that if the parking garage supervisor was called to testify, she would state that she found the knife near the front corner of the garage by Parc San Souci.

The parties entered another joint stipulation that Claire Guidry, the Acadiana Criminalistics Laboratory technician who tested the knife in evidence, was an expert in her field and that her analysis revealed to a reasonable scientific certainty that the victim's DNA was on the knife blade and that the knife handle contained a mixed DNA profile from which Defendant and the victim could not be excluded as potential contributors. Ms. Guidry's report was admitted into evidence.

Mr. Landry was the next witness to testify for the State.[3] He stated that he had known Defendant and Travis for several years from working with them. On October 13, 2012, he met up with the Toups brothers at a bar on Jefferson Street. Travis was heavily intoxicated, but he did not see Defendant consume any alcohol. They left the bar at about 1:30 a.m. and walked down the street single file, with him in the lead, followed by Defendant and then Travis. As they were walking passed the parking garage, they encountered the victim and four or five of his friends. The victim said something to him, but Mr. Landry ignored it and kept walking. He then heard words being exchanged between Travis and the victim, but he could not make out what was being said. Mr. Landry testified to hearing the word "jackass," but he did not know who said it. He acknowledged, however, that

---

[3] Before questioning him about this matter, the State asked Mr. Landry why he was dressed in orange. He explained that he was currently incarcerated as a result of his being convicted of multiple burglaries and batteries in three parishes. Mr. Landry admitted that he was nervous when first contacted by the police about this incident because he was on probation at the time and knew that he was not supposed to be going into bars.

7

when interviewed by the police, he told them it was said by one of the Toups brothers.

Upon hearing the verbal exchange, Mr. Landry turned around and saw the victim punch Travis in the face. Travis stumbled backwards but did not fall down. Immediately thereafter, in what Mr. Landry described as a protective manner, Defendant came up from behind Travis, pulled out his knife, and stabbed the victim in the chest. The victim, who did not appear to realize he had been stabbed, backed up and walked across the street, and Defendant ran toward his car. Mr. Landry confirmed that he did not see the victim with a weapon. Mr. Landry explained that after making sure that Travis was okay, the two of them met up with Defendant, and they all expressed shock about the situation and how quickly it had occurred. Mr. Landry then left to rejoin his other friends. According to Mr. Landry, Defendant told him his knife was in the parking garage. Upon questioning by the State, Mr. Landry stated he did not recall Defendant asking him to dispose of the knife, but he could not dispute that he may have told the police that Defendant asked him to retrieve the knife and dispose of it. Over the objection of the defense, the jury was then shown the videotape of Mr. Landry demonstrating to the police where and how the victim was stabbed.

Upon cross-examination by the defense, Mr. Landry recalled that as he and the Toups brothers were making their way from the bar toward the parking garage, he saw a man covered with blood who appeared to have been in a brutal fight. At the time, it did not appear to him that the person who injured that man had been apprehended because the police were not yet on the scene. Mr. Landry admitted that he was drunk that evening and that he may have been on "Mollies," an Ecstasy-type drug. Mr. Landry stated he felt outnumbered when they encountered

8

the victim with a group of five or so other people. He was also of the opinion that Travis was too intoxicated to have been able to defend himself that evening.

The next witness to testify was Travis, whom the State called on cross-examination. He stated that he was nine years older than Defendant. He admitted that he was very intoxicated the night of the incident and that he was not aware of whether or how much alcohol Defendant or Mr. Landry consumed that evening. After they left the bar and were passing the parking garage, a man bumped into him. Travis told the man, "Excuse the fuck out of me,'" and the next thing he knew, the man punched him in the face. Travis explained that everything went "kind of black" for a while, and when he was able to focus again, he saw who he thought was the man that hit him jumping into a car. He ran after the car to confront the man, even though he "couldn't fight to save his life at that point." According to Travis, Mr. Landry then grabbed him saying they had to go. After being punched, Travis did not see Defendant until he and Mr. Landry found him in his car. When Travis got into the car and asked Defendant what had happened, Defendant told him that he "really didn't know" and that "everything went crazy." Travis said he did not learn that Defendant had stabbed the victim until someone told him about it a day or so later. He then called Defendant, but Defendant told him they would talk about it when he got back from Texas.

On direct examination by the defense, Travis testified that he was missing a finger on one hand, had only partial use of and could not make a fist with the other hand. He also had a metal plate in one arm and half of his pelvic bone was missing due to an automobile accident. Travis testified that he and Defendant were very close, especially after losing their brother in an automobile accident.

Dr. Christopher Tape, a forensic pathologist, performed the autopsy on the victim. He testified that the victim was stabbed once in the chest. The knife penetrated four inches into the victim's chest cavity, perforating the sac that surrounded the heart and the right ventricle, and preventing his left lung from expanding. Dr. Tape said it would have taken significant force to penetrate the chest cavity, going through both bone and the tough tissue around the heart. He noted that the knife went horizontally into the victim's chest, which would not be consistent with him simply walking into the knife. Dr. Tape said it would have taken ten to twenty minutes for the victim to die, but he could possibly have been saved had he received immediate medical attention. The doctor testified that the toxicology report showed that the victim had several drugs in his system, including amphetamine; Xanax; the pain medicines, hydrocodone and buprenorphine; benzolylecgonine, a cocaine metabolite; and THC or marijuana. The victim also had a blood alcohol content of 0.215 percent, more than twice the legal limit to drive.

At trial, Defendant testified that he was thirty years old and was married with three children and was currently driving trucks for a living. He said he was in the National Guard because he wanted to serve his country. Defendant stated that since the stabbing, he had completely stopped drinking alcohol. Defendant explained that his parents divorced when he was two, and Travis was like a father to him. On the night of the stabbing, Travis had been drinking all day and had several drinks at the bar, but Defendant drank only three beers that evening. After leaving the bar, Defendant saw blood on the ground on Jefferson Street, and he was told that someone had been stabbed. He saw several police cars at the scene, but there was no indication that the perpetrator was in custody.

Defendant testified that "as we were passing the parking garage, I heard some chatter, some scuffling I guess. When I turned to look, my brother was already pretty much being attacked, and then I heard the guy yell out, I'm going to fucking kill you!" Defendant stated the victim "looked hyped up, very crazed, [and] like he was out for blood." The victim swung at Travis three times, but only one punch connected. Despite his involvement in the military and the fact that it was not easy for him to admit as much, Defendant stated he felt scared for his brother's safety, and he believed that the victim was capable of hurting Travis and unlikely to respond to a request to not harm Travis. Moreover, Defendant believed his intervention was necessary to protect Travis, given his brother's physical handicaps and intoxication and the fact that there had just been a stabbing nearby. Defendant explained that he pulled out his knife, pointed it at the victim, and as the victim was coming back toward Travis, his knife connected with the victim. He insisted that the situation happened very suddenly and that he did not have much time to think before intervening on his brother's behalf.

After the incident, the victim took off running across the street and Defendant ran in the other direction, thinking his brother was right behind him. Defendant stated that he was "pretty shaken up," and he tossed the knife into the parking garage area on the way to his car. Travis soon joined Defendant in his car, and Defendant told him that he may have stabbed a guy. Because they both had seen the victim run off and it appeared to them as though he was not "really hurt," Defendant said that he and Travis "didn't think much of it" and went home. About thirty minutes later, Defendant called Mr. Landry and asked him to pick up the knife that he had discarded if Mr. Landry was still downtown. At the end of his direct testimony, Defendant stated, "I want y'all to know that I am very sorry, very

sorry for y'all['s] loss. This is not what I intended on doing. I don't know if you can forgive me."

On cross-examination, Defendant explained that he did not receive hand-to-hand combat training in the National Guard. Defendant agreed that he did not see the victim with a weapon, and he did not try to hit or push the victim away. Defendant again acknowledged that because he was so scared at the time, he did not tell the police in the area that he had stabbed a man who had attacked him and Travis, nor did he contact the police over the next few days. On re-direct, Defendant testified that in hindsight, he may have acted differently, but in the heat of the moment, he did what he thought was necessary to protect his brother.

As noted above, justification for a homicide committed in defense of another must be predicated on the reasonable perception that the person attacked could have justifiably used such means himself and that intervention was necessary to prevent harm. In brief, Defendant argues the State failed to prove that "the killing was not a justifiable act of self defense," and he was clearly "only acting in self-defense of his brother Travis when he stabbed Darby as it appeared, in his mind, that Travis was going to receive great bodily harm at the hands of Darby."

In the context of self-defense as is claimed in the current case, this court observed in *State v. Griffin*, 06-543, pp. 8-9 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, 851 (alteration added), *writ denied*, 07-2 (La. 9/14/07), 963 So.2d 995:

> The standard in La.R.S. 14:20 is whether the Defendant's subjective belief that he was in danger was reasonable. *State v. Brown,* 93-1471 (La.App. 3 Cir. 5/4/94), 640 So.2d 488.
>
> > Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the

12

> assailant's bad character. *State v. Hardeman,* 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Brown*, 414 So.2d 726 (La. 1982).

*State v. Spivey*, 38,243, p. 6 (La.App. 2 Cir. 5/12/04), 874 So.2d 352, 357.

> In cases where the defendant claims self-defense as a justification, the absence of a weapon from the victim's person or immediate reach is often a critical element of the state's proof. *See State v. Davis,* 28,662 (La.App. 2d Cir. 9/25/96), 680 So.2d 1296. . . . The absence of [a] weapon on the victim, however, is not dispositive of the issue.

> . . . .

*State in Interest of D.S.*, 29,554, p. 3 (La.App. 2 Cir. 5/7/97), 694 So.2d 565, 567.

In the instant case, Defendant produced a knife at a fist fight. The State contends that while Defendant had the right to defend his brother, the use of deadly force was not necessary under the circumstances and was unreasonable. The State further points out that despite the fact that the police were immediately available, Defendant made no effort to advise them of the incident.

At trial, Defendant asserted that because the victim ran away after being stabbed, neither he nor Travis thought the victim was badly hurt, so they left the scene without giving it much thought. On the other hand, Defendant threw the knife away and later asked Mr. Landry to retrieve it. As noted above, factors to consider when evaluating a claim of self-defense or defense of another are the confusion and excitement of the moment, whether the defendant could have used less than deadly force, and the defendant's knowledge of the attacker's poor character.

13

In brief, Defendant argues that he was on "heightened alert" and "went into his protective mode" when he saw Travis being attacked by a crazed man who was threatening to kill Travis. However, while Defendant testified at trial that he saw blood on the sidewalk and saw police cars down the street, he did not see a stabbed person. Defendant did not know the victim prior to this incident, nor did he know that the victim was drunk and high on drugs. He was likewise unaware that security videotape taken during the earlier incident that evening showed the victim yelling into the crowd. Defendant claimed he heard the victim threaten to kill his brother, but Mr. Landry, who was observing the interaction between the victim and Travis, did not hear anything other than one of the Toups brothers say "jackass." Moreover, although the testimony established that the victim, Travis, and Defendant were all about the same height and weight, Defendant admitted that he did not make an effort to push the victim away, hit him, talk him down, or pull his brother out of the victim's reach. Finally, the videotaped re-enactment of the incident as described by Mr. Landry showed that Defendant simply swept past his brother and stabbed the victim in the chest without so much as a shout of warning.

In light of the circumstances, we find that the level of violence inflicted on the victim was not necessary to protect Defendant's brother from imminent danger of losing his life or receiving serious bodily harm. Thus, considering the evidence in a light most favorable to the prosecution, we conclude that reasonable jurors could have found that the State met its burden of negating Defendant's assertion that the killing was a justifiable act of self-defense.

### *Excessiveness of Sentence*

Defendant was convicted of negligent homicide. The sentencing range for the offense of negligent homicide is imprisonment of not more than five years,

14

with or without hard labor, and a fine of not more than five thousand dollars, or both. La.R.S. 14:32(C)(1). Defendant was sentenced to two years imprisonment at hard labor and was ordered to pay restitution to the family of the victim in the amount of six thousand dollars. Defendant argues that considering the circumstances of the case, a prison sentence of two years is a constitutionally excessive sentence.

"The trial judge is given wide discretion in imposing a sentence, and a sentence imposed within the statutory limits will not be deemed excessive in the absence of manifest abuse of discretion." *State v. Rogers*, 07-276, p. 2 (La.App. 3 Cir. 10/3/07), 966 So.2d 1212, 1214 (quoting *State v. Walker*, 96-112, p. 4 (La.App. 3 Cir. 6/5/96), 677 So.2d 532, 534-35, *writ denied*, 96-1767 (La. 12/6/96), 684 So.2d 924. In *State v. Pope,* 47,486, 47,487, pp. 2-3 (La.App. 2 Cir. 9/26/12), 106 So.3d 600, 602-03 (citations omitted), the second circuit noted:

> The test applied by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. There is no requirement that specific matters be given any particular weight at sentencing.

> Second, a sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice.

In reviewing the trial court's sentencing discretion, an appellate court should consider: "1. The nature of the crime, 2. The nature and background of the offender, and 3. The sentence imposed for similar crimes by the same court and other courts." *State v. Whatley*, 06-316, p. 5 (La.App. 3 Cir. 11/2/06), 943 So.2d 601, 605, *writ denied*, 06-2826 (La. 8/31/07), 962 So.2d 424.

At the sentencing hearing, the trial court noted it had reviewed the presentence investigation report and letters sent to the trial court on behalf of the family of the victim and Defendant. The trial court heard testimony from the victim's parents regarding the loss of their only child and from the victim's uncle and grandparents. The trial court heard testimony given on Defendant's behalf by his supervising sergeant with the Louisiana National Guard. Defendant's wife also testified, stating that Defendant was the sole support of her and their three children. She also advised the trial court that she was pregnant with their fourth child at the time of the sentencing hearing. Defendant's older brother, Ryan Toups, spoke about Defendant's upbringing in a broken home and the difficulties Defendant faced as he grew up. Ryan also spoke of Defendant's dedication to the church and how much Defendant helped with the needs of his family and friends.

Following arguments by defense counsel and the State, the trial court stated for the record:

> Mr. Toups, in mitigation, I know that you are a - - technically, a first felony offender at this time. Your state of mind, you had just seen a stabbing. The victim hit your brother. You did show remorse, and you quit drinking.
>
> But in aggravation, once you stabbed him the one time in the heart, you offered no assistance to assist him and allowed him to wander off and die in the dirt.

16

I feel a appropriate sentence would be, and I will issue a sentence of two (2) years hard labor. You will be given credit for any time that you've served on this charge. You have to pay restitution of $6,000 to the victim for part of their expenses. The reason I reduced it somewhat was because of the fact that you did not initiate the violence that occurred that night.

Here, the trial court had the information provided by the presentence investigation report. The trial court noted that Defendant was a first-time felony offender. The trial court also noted that he failed to report the stabbing, when he could have possibly helped the victim. Finally, the trial court had the benefit of Defendant's background information given by his family at the sentencing hearing.

In *Rogers*, 966 So.2d 1212, the defendant was convicted of negligent homicide. The defendant was driving a friend and her young son home one evening at a speed of ninety miles per hour when he lost control of the vehicle and struck a tree. The friend burned to death in the vehicle. The defendant and the victim's son were not seriously injured. The defendant hitchhiked with the boy and left him on his grandparents' front porch. The defendant did not report the accident. Although he was additionally charged with hit-and-run driving, that charge was dismissed when he pled guilty to negligent homicide. He received three-and-a-half years imprisonment at hard labor. On appeal, the defendant claimed the sentence was excessive for the reason he had no prior criminal history and was only nineteen at the time of the accident. Citing *State v. Beverly*, 03-1348, p. 2 (La.App. 3 Cir. 3/3/04), 867 So.2d 107, 110 (footnotes omitted), this court noted in *Rogers,* 966 So.2d at 1214, that:

> A trial court must look at the particular circumstances of the case and the defendant's background in order to impose a sentence that is suited for him. On review, the issue is not whether another sentence would have been more appropriate; rather, it is whether the trial court abused its discretion.

17

This court found the defendant's sentence appropriate and noted the following

cases in comparison:

> In *State v. Hughes*, 03-420 (La.App. 3 Cir. 12/31/03), 865
> So.2d 853, *writ denied,* 04-663 (La.12/24/04), 882 So.2d 1165, the
> maximum sentence of five years imposed on a conviction for
> negligent homicide was found not to be excessive even though
> Hughes was a first time felony offender and the mother of four
> children. In that case, Hughes attempted to commit suicide by driving
> at a high rate of speed into the path of an oncoming pick-up truck.
> The driver of the pick-up was killed. This court stated:
>
>> The trial court cited the applicable factors set forth in
>> La.Code Crim.P. art. 894.1, noted Defendant's lack of a
>> criminal record and letters of support in her favor; but,
>> concluded Defendant's "wanton and reckless disregard
>> for the lives and safety of others . . . dictates a sentence
>> that fits the nature of this offense." The trial court did
>> not abuse its discretion in sentencing this Defendant to
>> the five-year maximum term of imprisonment.
>
> *Id*. at 860.
>
> In *State v. Gregrich*, 99-178 (La.App. 3 Cir. 10/13/99), 745
> So.2d 694, this court affirmed a sentence of three years imposed on a
> conviction for negligent homicide. Gregrich, who was legally
> intoxicated at the time, drove his car left of center and hit an
> oncoming car head on, killing the driver. In *State v. Clark,* 529 So.2d
> 1353 (La.App. 5 Cir.1988), the fifth circuit affirmed a three-year
> sentence imposed on a conviction for negligent homicide. In that
> case, Clark was also determined to be intoxicated at the time and
> drove through a stop sign, striking the victim's vehicle. The victim
> died as a result of the accident. Clark had previous convictions for
> driving while intoxicated.

*Rogers,* 966 So.2d at 1215.

Finally, in *Pope,* 106 So.3d 600, the defendant went to his estranged wife's

home where he argued with her for losing a credit card. Giving up on the

argument, the defendant went out to his vehicle to leave. The wife followed him

out and began beating his vehicle with a toy lawn mower. As he attempted to get

into the vehicle, she grabbed him and a gun he was carrying discharged and shot

her in the head, killing her. The second circuit did not find the maximum sentence of five years to be excessive, stating:

> Here, the trial court adequately considered the criteria set forth in La. C. Cr. P. art. 894.1, and neither sentence was excessive. First, the record reflects that during Pope's sentencing hearing, the trial court stated its consideration of the factors enumerated within La. C. Cr. P. art. 894.1. Specifically, as to the negligent homicide conviction, the trial court noted that it had read letters from both the defendant's family and from the victim's family. Further, the court noted that the crime involved the use of a firearm. Finally, the trial court stated that any lesser sentence than that given to Pope would deprecate the seriousness of the offense which Pope committed. As to the felony theft, this crime was committed while Pope was out on bond. Considering the seriousness of the convictions and Pope's callous disregard for the law while on bond, the trial court's sentences do not reflect a needless infliction of pain and do not shock the sense of justice.

*Id.* at 603.

In the current case, considering the nature of the offense, the circumstances surrounding the stabbing, and the comparison of similarly situated defendants, we cannot say that the trial court abused its vast discretion when it sentenced Defendant to two years imprisonment at hard labor, less than one half of the potential term of imprisonment. The sentence does not shock this court's sense of justice, and thus, it will be affirmed.

## **DECREE**

Defendant's conviction and sentence are affirmed. We direct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending written notice to him within ten days of the rendition of this opinion and to file written proof in the record that the Defendant received the notice.

**AFFIRMED WITH INSTRUCTIONS.**